FOURNET, Justice.
The plaintiff instituted this suit to recover $1,588.44 from the Cotton Trade Warehouses, Inc., and its insurer, The Employ•ers’ Liability Assurance Corporation, Ltd., for the cost of repairing his passenger bus, -allegedly damaged through the negligent operation of the corporation’s tractor-trailer unit in attempting to negotiate a left turn across a four-lane highway in front of the plaintiff’s bus that was then too close to avoid striking the unit, and the •sum of $3,000 for the loss of business during the time the bus was under repair.
The defendants, denying the accident occurred as alleged, averred the truck unit had already turned across the highway and was almost entirely out of the westbound traffic lane at the time of the accident, which they charged was caused by the negligence of the plaintiff’s bus driver in traveling at such, a rapid rate of speed he could not bring the bus to a stop and avoid striking the trailer unit, and the warehouse corporation sought, by way of reconvention, to recover $496.48 from the plaintiff for the cost of repairing the damaged trailer. In the alternative the defendants pleaded the contributory negligence- of the bus driver.
After trial on the merits judgment was rendered in favor of the plaintiff for the cost of repairing the bus, $1,588.44, but his demand for anticipated loss of earnings was rejected, as was also the reconventional demand. The defendants appealed from this judgment and the plaintiff, answering the appeal, seeks to have the judgment amended by including therein the $3,000 claimed for loss of earnings.
The record reveals that this accident occurred shortly after noon on May 3, 1946, on the St. Bernard Highway just west of the Old Menefee Airport, at the point where the road extending to the Mississippi river and leading to the Chalmette slips intersects the highway. The 59-foot highway at this point is composed of four lanes separated by a 15-foot neutral ground, the outside lanes on each side of the highway being 12 feet wide and the inside lanes 10 feet wide. To permit easy access to the side road, the neutral ground here is cut with pavement that runs along with the rest of the paved highway for some 50 feet. Approximately a block below the scene of the accident the road makes a sharp turn, with the result that it is impossible to see in the rear-vision mirror of a vehicle proceeding toward New Orleans any vehicle approaching from the rear that has not yet negotiated this curve. One approaching from the rear, however, is not prevented from seeing *695 the traffic ahead for two or three blocks, because of the clear view across this curve.
The tractor-trailer unit, carrying 50 drums of aviation gasoline weighing 500 pounds each and proceeding along the western side of the St. Bernard Highway toward New Orleans in the outside lane at approximately 15 miles an hour, had passed this turn in the road and was continuing along the straight part of the highway that runs approximately 360 feet from this curve to the point where the side road to the slips intersects it. Slowing down to approximately 5 miles an hour and ascertaining from the rear-vision mirror that the road behind him was free of traffic in so far as he could tell by his mirror, the driver of the truck turned from the right or outside traffic lane across the inside lane, across the paved portion of the middle of the road that cuts through the neutral ground, across the two traffic lanes on the east side of the highway and was poised at the rise where the side road enters the highway, with the rear end of the truck and trailer projecting a few feet beyond the neutral ground into the ipside traffic lane on the west side of the highway, when the left rear end of the trailer was struck by the plaintiff’s bus, then proceeding toward New Orleans in the inside lane on the west side of the highway on one of its regular passenger trips between Violet and the Industrial Canal.
It is the contention of the plaintiff, in which he was supported by the trial judge, that the bus was traveling lawfully along the left or inside traffic lane at a rate of 30 ■ miles an hour and had given the proper-signal to pass the truck unit, then traveling-in the outside lane, when the unit, in an effort to enter the side road leading to the-Chalmette slips, suddenly and without proper warning turned to the left in front of the bus when it was only 20 or 25 feet away, this unheralded turn by the truck driver-being the cause of the accident.
The defendants contend, on the other hand, that had the position of the two-vehicles been as claimed by the plaintiff, it would have been a physical impossibility for the accident to have happened as it did, since it is revealed by the evidence that the plaintiff’s vehicle was traveling between 30' and 35 miles an hour while approaching this crossroad and the truck unit was negotiating the left turn in low gear at a rate of 5 miles an hour, under which circumstances the bus would have either avoided the accident by passing the point before the truck unit reached the left or inside traffic lane in its turn, or would have collided with the truck unit near the front end, depending upon the distance the approaching bus was from the scene at the time the-unit began to make the turn. The defendants’ version of the accident is, that at the time the truck unit began to make the turn into the side road the roadway to the rear-was free of traffic back to the point where the curve began and that the truck driver,, proceeding with due care, crossed the en— *697 tire width of the highway and reached the edge of the side road, almost clearing the inside lane of traffic on which the bus was traveling, when it was struck by the oncoming bus on the left rear end of the trailer.
A study and analysis of the evidence in the record unmistakably shows, in our opinion, that the accident occurred in the manner claimed by the defendants. Clearly at the speeds the two vehicles were moving at the time of the accident the on-coming bus must have been between 200 and 300 feet behind the truck at the time it began to make the turn, for the witnesses are unanimous, and are corroborated by the physical facts, that at the moment of the impact, the truck cab had travelled across the entire highway, a distance of some 50 feet, and was at the edge of the intersecting road, with the rear end of the trailer a few feet into the inside traffic lane on which the bus was traveling. Under these conditions the driver of the bus was either not looking, as he said he was, or he believed the truck was going to clear his side of the highway before the bus reached that point.
We think the testimony of the defendants’ only eyewitness, J. D. Johnson, the driver of the truck unit (his helper who was in the cab with him at the time of the accident was not produced as a witness because he could not be located), clearly supports this view. He testified that when approximately a half a block from this intersecting road and observing through his rear-vision mirror that the road behind him was olear of traffic, he slowed the truck to 5 miles ah hour, threw it into low gear, started toward the center of the highway, and began to swing the trailer into the side road at this low speed because at a faster speed the heavy drums he was carrying would have burst through the wooden sides of the trailer; that when the tractor of the unit was across the highway and hitting the shell road he stopped completely for the purpose of putting the truck into “double-load” to go up the slight incline in the side road, and it was at this instant that the bus “lammed” into the rear end of the trailer that he found, when he got out of the cab, was projecting into the highway about a foot and a half. beyond the neutral ground on the west side. He estimated this truck unit (including tractor and trailer) was approximately 40 feet long, and that it took him 5 or 6 seconds to make the turn because of the swing he had to give the trailer.
His testimony with respect to the position of the cars at the time of the impact is - corroborated by the defendants’ witnesses Robert Mahony, a claim adjuster for the insurer, who measured the truck unit and the distances at the scene of the accident, and Arthur Guttie~rez, who reached the scene of the accident about 4 minutes after it occurred, and who stated that at that time the bus was partly on and partly off the neutral ground and the rear end of the trailer extended a short distance into the highway, estimated by him to be anywhere be *699 tween 1 and 4 feet. The plaintiff’s witnesses also corroborate Johnson’s version of the respective position of these vehicles, the only variation in their statements being with respect to the distance beyond the neutral ground the trailer protruded.
While the plaintiff offered the testimony of several eyewitnesses — Albert Henderson, the bus driver, and several passengers, Eugene Perez, Mrs. Edward Molero, Alvin Pluche, and Mrs. John Ohler — an analysis of their testimony reveals that it is not only contradictory in many respects but that these witnesses are in conflict one with the other and that in many material aspects they corroborate the testimony of the unit’s driver, Johnson.
The bus driver and Perez, who sat immediately behind the driver in the bus, did testify the unit began to make the left turn when the bus was only 20 or 25 feet behind the truck. But they are totally discredited by the fact that the bus, traveling between 30 and 35 miles per hour, struck the extreme left end of the trailer just about at the rear wheel instead of striking the truck near the front end, which would have been the case had their version been correct since the truck unit, measuring approximately 40 feet, was traveling at a rate estimated to be 5 miles an hour, or only 7.3 feet per second. Traveling at the rate of 30 miles an hour (and some estimated this speed was as great as 35 miles an hour), the bus was covering approximately 44 feet per second, which means that if the truck began to make the left turn when the bus was only 20 or 25 feet behind it, the bus struck it within half a second after the turn was begun, which is, of course, an impossibility since the physical facts show the bus struck the truck on the left rear of the trailer and the trailer, which was 40' feet long and was traveling at a rate of 5 miles an hour, or 7.3 feet per second, had therefore traveled approximately 50 feet across the highway at that time. Since the truck driver estimated it took him 5 or 6 seconds to make the turn (which estimate is correct at the rate the unit was then traveling), this means that the bus, traveling 44 feet a second, must-have been between 200 and 300 feet to the rear at the time the turn was begun.
Besides, Henderson’s testimony is otherwise unimpressive. In many important aspects he contradicts himself while in others he is completely impeached not only by the physical facts, but by other witnesses of the plaintiff. For example, he stated he decided to pass the truck and first blew his horn when he was approximately a block, or 360 feet, away. On cross-examination he says when he decided to pass the truck and blew his horn it was 20 or 25 feet ahead; still again that he was 50 or 60 feet to the rear of the truck when he first blew his horn. As another example, he stated most positively on direct examination that the rear-vision mirror attached to the tractor part of the truck unit extended only *701 14 inches although the trailer, immediately behind the tractor, was 22 inches wider than the cab at this point. Johnson, the truck driver, testified this mirror extended about 6 inches beyond the trailer part of the unit and the picture of the unit that was taken immediately after the accident and was introduced in the case as an exhibit, shows this mirror does extend beyond the trailer’s side.
• The plaintiff’s other witnesses who were in the bus in no way corroborate the driver nor support the version of the plaintiff. Mrs. Molero testified she was sitting in the front seat on the right side of the bus engaged in conversation with Mr. Navis, a fellow passenger, when she looked up after hearing the repeated sounding of the horn, just in time to throw her hands in front of her face before the bus struck the left rear end of the trailer, then near the neutral ground, "just as the trailer was about to clear the highway." This clearly indicates the bus was right on the trailer when the horn was blown and that the driver had either not seen the truck up to that moment or else that he believed it would have completed the turn and cleared the highway before he reached that point. Of course, the reason it did not clear the highway was because the driver of the truck had to come to a complete stop in order to put the truck into “double-load” before going up the incline into the side road. Italics ours.)
Alvin Pluche, who estimated the bus was. going between 30 and 35 miles an hour, said he was not looking forward until the horn was blown by the driver, that they were then about 300 feet behind the truck, and that when they had reached a spot about 150 feet behind the truck the bus driver again sounded the horn. He estimated that when the truck began to make the turn the bus was between 125 and 150 feet to the rear. He observed that the bus driver kept driving “straight ahead and before the trailer could clear the end of the road he hit the end.” He further stated that in another second the lane would have been clear and the bus would have passed the spot without any trouble. This version, given by the plaintiff’s witness, more nearly, in our opinion, approximates what actually happened.
Mrs. Ohler, while giving testimony that is unsatisfactory in many respects that are not necessary to detail here, did testify the truck began to make the turn when the bus was 100 feet behind.
We therefore conclude that the sole and proximate cause of the accident was due to the negligence and carelessness of the driver of the bus and, accordingly, the plaintiff is answerable to the warehouse corporation for the damages caused the trailer.
Although the warehouse corporation asked in reconvention the sum of $496.48, it conceded on the trial of the case that the *703 actual cost of repairing the trailer was $253.18, and proof was made accordingly.
For the reasons assigned the judgment appealed from is annulled and set aside and it is now ordered, adjudged, and decreed that there be judgment rejecting the claims of the plaintiff, Joseph Capone, against the Cotton Trade Warehouses, Inc., and The Employers’ Liability Assurance Corporation, Ltd., and it is further ordered that there be judgment in reconvention in favor of the Cotton Trade Warehouses, Inc., and against the plaintiff, Joseph Capone, for the sum of $253.18, with legal interest from judicial demand; the plaintiff to pay all costs of this proceeding.